**ARMADA SUPPLY INCORPORATED, Plaintiff–Appellee–Cross–Appellant,**

**v.**

**Philip Gaybell WRIGHT, individually and on behalf of all other Underwriters at Lloyd's and New Hampshire Insurance Co., Ltd., Individually and on behalf of all other insurance companies, subscribing to policies of Marine Insurance set forth in Willis Faber & Dumas, Ltd., Cover note No. CS 5527, Defendants–Appellees,**

**Banorte Seguradora S.A., Itau Seguradora S.A., Atlantica Cia. Nacional de Seguros, Bamerindus Cia. de Seguros, Sul America Terrestres, Maritimos E Acidentes Cia. de' Seguros, Sul America Cia. Nacional de Seguros, Cia. de Seguros Alianca da Bahia, Nacional Companhia de Seguros, Cia. Internacional de Seguros, Comind Companhia de Seguros, Brasil Cia. de Seguros Gerais, Cia. Bandeirante de Seguros Gerais, Companhia Paulista de Seguros, Patria–Cia. Brasileira de Seguros Gerais, Boavista Cia. de Seguros de Vida E Acidentes, Sasse Cia. Nacional de Seguros Gerais, Cia. de Seguros do Estado de Sao Paulo, Vera Cruz Seguradora S.A., Skandia–Boavista Cia. Brasileira de Seguros, Unibaco Seguradora S.A., Yorkshire–Corcovado Cia. de Seguros, Cia. Real Brasileira de Seguros, Cia. Uniao de Seguros Gerais, Cia. de Seguros Minas Brasil, Generali do Brasil Cia. Nacional de Seguros, Seguradora Brasileira Motor Union Americana S.A., Porto Segura Cia. de Seguros Gerais, Interamericana Cia. de Seguros Gerais, Bemge Cia. de Seguros de Minas Gerais, Cia. de Seguros da Bahia, America Latina Cia. de Seguros, Cia. de Seguros America, do Sul Yasuda, Cia. Uniao Continental de Seguros, Allianzultramar Cia. Brasileira de Seguros, Real Seguradora S.A., Sao Paolo Cia. Nacional de Seguros, Fortaleza Cia. Nacional de Seguros, Banerj Seguros, S.A., Novo Hamburgo Cia. de Seguros Gerais, Phoenix Brasiliera Cia. de Seguros Gerais, Argos Companhia de Seguros, Compemi Seguradora S.A.–Capesa, Ajax Cia. Nacional de Seguros, Finasa Segurandora S.A., Farroupilha Cia. Na-**

cional de Seguros, Santa Cruz Cia. de Seguros Gerais, Cia. Colina de Seguros, Cia. de Seguros Cruz–Eiro do Sul, Cia. de Seguros Maritimos E Ter. Phoenix de Porto Alegre, Itatiaia Cia. de Seguros, Universal Cia. de Seguros Gerais, Parana Cia. de Seguros Germano–Brasileira, a Maritima Cia. de Seguros Gerais, Seguradora Industrial E Mercantil S.A., Baloise–Atlantica Cia. Brasileira de Seguros, Cia. Adriatica de Seguros Gerais–C.A.S., Federal de Seguros S.A., Sul Brasileiro Seguros Gerais S.A., Prudential–Atlantica Cia. Brasileira de Seguros, Cia. Sul Brasil de Seguros Terrestres E. Maritimos, Cia. Excelsior de Seguros, a Inconfidencia Cia. Nacional de Seguros Gerais, Maua Cia. de Seguros Gerais, Banreal Seguradora S.A., Commercial Union do Brasil Seguradora S.A., Cia. Patrimonial de Seguros Gerais, Cia. de Seguros Monarca, London Seguradora S.A., Brasileira Seguradora S.A., Lloyd Industrial Sul Americano–Companhia de Seguros, Concordia Cia. de Seguros, Cia. Renascenca de Seguros, Auxiliar Seguradora S.A., Itau Winterthur Seguradora S.A., GB–Confianca Cia. de Seguros, Indiana Cia. de Seguros Gerais, Safra Seguradora S.A., Kyoei do Brasil–Cia. de Seguros, Gerling Sul America S.A. Seguros Industrials, Hannover Internacional de Seguros S.A., Companhia Sol de Seguros, Banestes Seguros S.A., Cia. de Seguros Previdencia do Sul, Cia. Anglo Americana de Seguros Gerais, Cia. de Seguros Sul Americana Industrial–S.A.I., Noroeste Seguradora S.A., Pan Americana de Seguros S.A., Delfin Seguradora S.A., Cia. de Seguros Rio Branco, Cia. de Seguros Inter–Atlantico, SDB Cia. de Seguros Gerais, and the Reinsurance Institute of Brasil, Defendants–Appellants–Cross–Appellees.

Nos. 565, 645, Dockets 87–7788, 87–7852.

United States Court of Appeals,
Second Circuit.

Argued Feb. 5, 1988.
Decided Sept. 22, 1988.

Francis R. Matera, New York City, for defendant-appellant-cross-appellee Banorte Seguradora S.A.

George L. Graff, New York City (Nancy L. Savitt, Milgrim Thomajan & Lee, New York City, of counsel), for plaintiff-appellee-cross-appellant Armada Supply Inc.

Richard G. Ashworth, New York City (Michael L. Sommer, Haight, Gardner, Poor & Havens, New York City, of counsel), for defendants-appellees Philip Gaybell Wright, et al.

Before TIMBERS, WINTER and ALTIMARI, Circuit Judges.

WINTER, Circuit Judge:

This appeal and cross-appeal concern claims under two insurance policies for losses incurred by Armada Supply Incorporated ("Armada") arising out of a shipment of fuel oil from Rio de Janeiro to New York. Following a bench trial, Judge Griesa awarded Armada $1,462,722.64, plus interest at the three month rate for Treasury bills, against the lead underwriter, Banorte Seguradora, S.A. ("Banorte"), individually and on behalf of the other Brazilian underwriters. He further ruled that Philip Gaybell Wright and the other participating underwriters at Lloyd's and elsewhere in London (the "London underwriters") were liable for $85,808.34.[1] Judge Griesa's opinion is reported at 665 F.Supp. 1047 (S.D.N.Y. 1987).

Banorte has appealed from the judgment, contending that the district court lacked personal jurisdiction over it or, alternatively, that certain shortage losses, contamination losses, and "sue and labor" expenses incurred in reconditioning a shipment of contaminated oil allowed by the district court, should be disallowed and/or reduced. Armada has cross-appealed, claiming that the London underwriters, who insured Armada under an open-cover marine policy, were liable for that portion of Armada's loss on its contract to sell the oil to Sun Oil Trading Co. ("Sun") not covered by Banorte ($1,298,813.03) and, at least contingently, for the same losses—an amount alleged on appeal to be $2,794,-315.35—insured by Banorte. Armada also disputes the district court's calculation of contamination loss, shortage loss, and sue and labor expenses.

We hold that the district court had personal jurisdiction over Banorte, and that the increased-value clause of Armada's open policy of marine insurance with the London underwriters insured cargo loss and damage, but not the loss of Armada's profitable contract with Sun. We further hold that the contingency-cover clause of the London policy was not applicable on these facts, that the London underwriters did not waive their position that this clause was inapplicable, and that the district court correctly calculated most of Armada's losses. However, we reverse on the cross-appeal as to some of the sue and labor claims.

---

1. Banorte had already advanced Armada $1 million; the London underwriters had advanced $100,000 and were therefore due a credit.

## BACKGROUND

The facts are relatively straightforward. Armada, a Texas corporation, entered a contract in April 1982 to purchase four shiploads of oil from Petrobras, a Brazilian oil company, to be delivered over a period of four months. The sales were to be C.I.F. (cost, insurance, freight) port of delivery, meaning that Armada would take title in Rio de Janeiro but Petrobras would pay freight to New York (or Rotterdam) and purchase marine insurance. The contract provided that the price would be based on the spot oil price at the point and time of delivery.

The cargo at issue here was the last shipment under the April 1982 contract. On November 16, 1982, it was onloaded to the AGIOS NIKOLAS at Rio de Janeiro. The bill of lading specified that 348,000 barrels (52,066 metric tons) were to be onloaded, although only 340,000 barrels were actually onloaded. At some point during the voyage to New York, the crew of the AGIOS NIKOLAS apparently used part of the cargo for fuel and then pumped sea water into the cargo tanks, thereby contaminating the fuel tanks and creating a shortfall of oil. The vessel arrived in New York on December 9, 1982, but shortly thereafter left temporarily to evade legal process. After the conclusion of complex negotiations among the parties in which Armada agreed to pay the freight and not to arrest the vessel, the vessel returned. Armada has since obtained a damage award, uncollectable to date, against the ship's owners for $4,130,900. *See Armada Supply, Inc. v. S/T Agios Nikolas,* 613 F.Supp. 1459 (S.D.N.Y.1985).

On October 29, 1982, prior to the AGIOS NIKOLAS's departure from Rio de Janeiro, Armada entered into a contract with Sun Oil providing for a sale of approximately 330,000 barrels (49,000 metric tons), plus or minus ten percent at Armada's option. This sale was to be on a delivered basis, meaning that until Sun took title in New York, the oil would be at Armada's risk. Since the contract price was fixed at $30.55 per barrel, Armada would earn a substantial profit if oil prices fell before the oil

reached New York. As it turned out, the New York spot oil price had fallen to $25.70 per barrel when the AGIOS NIKOLAS arrived in New York. Due to the contamination, however, Sun refused to accept the oil. Sun later agreed to buy only 49,000 barrels at $27.40 per barrel. If the Sun contract had not been lost, Armada would have made $4.85 per barrel or a total profit of approximately $1.6 million. Instead, Armada had to recondition the oil and then try to sell it. Armada eventually made six separate sales, the last on March 16, 1983, to various oil companies.

Petrobras had an open marine-insurance policy with Banorte and ninety-four other Brazilian underwriters covering the oil. Open marine policies are widely used in the United States. *See* L. Buglass, *Marine Insurance and General Average in the United States* 10 (2d ed. 1981). Under such policies, the assured has automatic coverage subject to the terms set forth in the cover letter. *Id.* The Brazilian policy was subject to the London Institute Cargo Clauses (All–Risks), and thus covered the shortage and contamination losses involved in the instant case. The amount of coverage was equal to $28.27 per barrel ($25.70 New York spot price on date of shipment plus ten percent). Total coverage was $9,855,333.

Armada also had an open policy of marine insurance with the London underwriters for the period April 20, 1982 to April 19, 1983. This insurance was purchased through Johnson & Higgins ("J & H"), a Houston broker, who in turn dealt with Willis Faber & Dumas, Ltd., a broker in London. The cover note for this insurance provided for "continuous cover" for shipments within the one-year period. It further specifically provided that the interest covered was "CRUDE OIL IN BULK." No mention was made of loss of profit or loss of a contract as a risk. The London policy contemplated that Armada might purchase oil on various terms. It might, for example, purchase F.O.B. (free on board) a foreign port, which meant that it would take title in the foreign port and have to purchase its own insurance for the

voyage, or, as was done in the instant case, make a C.I.F. purchase.

Two clauses in the cover letter of the London policy are relevant to this litigation. The increased-value clause covered cases where Armada purchased C.I.F. and resold non-C.I.F., with the result that Armada did not provide insurance to its buyer but was itself the beneficiary of insurance during the voyage.[2] This clause insured Armada for the increased value arising from the non-C.I.F. resale, and the increased-value arising from a rising market without a resale. Judge Griesa found that the increased-value coverage was only for physical loss or damage, and that the function of such coverage was to increase the insured value over what it was under the Brazilian coverage. 665 F.Supp. at 1066. Armada claims on appeal that the increased-value provision provided it with insurance against loss of profits on the Sun transaction, less what was recovered on the primary Brazilian insurance. Moreover, Armada contends on appeal that, even if the increased-value clause would normally provide insurance only against physical loss, the parties agreed to coverage of lost profits at a meeting between representatives of Armada and J & H in Houston on November 30, 1982. Judge Griesa rejected this claim after a detailed examination of the events of this meeting, which we need not repeat. *Id.* at 1059–61.

The second clause concerned "contingency coverage."[3] Such coverage was necessary when Armada purchased on C.I.F. terms and resold on C.I.F. terms, and Armada would be obligated to provide insurance to its purchaser. Contingency coverage would make the London underwriters liable if the Brazilian underwriters failed to pay on their primary coverage. Judge Griesa found that the London underwriters were not liable for contingency coverage because Armada did not comply with the requirements of the cover note for such coverage, namely back-to-back C.I.F. sales. *Id.* at 1067. On appeal, Armada argues that the provisions of the policy were changed by Armada and J & H and waived by J & H's billing and collection of a premium. Judge Griesa found that: (i) J & H did not clearly understand the situation and mistakenly billed Armada for the premiums on the contingency coverage; (ii) it was apparently not until February 1983 that the London underwriters received documents permitting resolution of the question of whether the London coverage had been in-

2. The relevant provision was as follows:
   *INCREASED VALUE IN RESPECT OF C.I.F. PURCHASES:* It is also agreed that, in respect of interest bought on C.I.F. terms, this insurance is extended to cover, on concurrent conditions, increased value which may occur during the period of this insurance, it being understood and agreed that, in the event of the vessel or interest being lost, the period of cover for ascertainment of increased value *shall be the period between commencement* of risk and the estimated time of arrival at port of destination.
   The sum insured shall be:
   (a) *If bought against sales:*
   The difference between the sum insured by seller(s) and the sum stipulated in the sales contract or, if required by the buyer(s) the highest market value reached during the period defined above.
   　　\*　\*　\*　\*　\*　\*
   *Additional Premium:*
   0.01% payable on the contract purchase price of all shipments attaching hereunder.

3. The relevant provision of the cover note for contingency coverage provided as follows:
   *C.I.F. Purchases:* It is agreed that where the Assured purchase goods on C.I.F. terms and sell on C.I.F. terms, but wish to give their buyer a certificate for their Sales Price that they may issue certificates for the full value hereunder.
   Underwriters hereunder to have the benefit of the original suppliers certificates held by Wills Faber & Dumas Ltd.
   Surveys in the event of loss and/or damage to be conducted by the Agent specified on the original suppliers certificate in order to preserve Underwriters rights of recourse thereunder.
   This insurance not to be deemed a double insurance.
   *Premium payable as follows:*
   (1) Where the original suppliers certificate is in force for the entire period of risk:
   (a) *Marine:*
   Rate(s) as per cover payable on the Increased Value, if any, which see (3) below.
   (b) *Contingency:*
   0.02625% payable on the full value of the original suppliers certificate(s) but at rates to be agreed where the conditions on the original suppliers certificate(s) are narrower than those on the certificate(s) issued hereunder.

creased-value or contingency insurance, and (iii) the receipt of the premium by the London underwriters was an obvious mistake. *Id.* at 1063, 1067–68.

■ An assured typically has a duty to mitigate damages. In this case, Armada mitigated by reconditioning the oil for the six sales. The expenses an assured incurs in mitigating damages are called "sue and labor" expenses. *See Seaboard Shipping Corp. v. Jocharanne Tugboat Corp.*, 461 F.2d 500, 503 (2d Cir.1972); L. Buglass, *supra*, at 332–39. Judge Griesa awarded a total of $1,116,791.42 in such expenses. 665 F.Supp. at 1075–77. The district court found that only the Brazilians were liable for such expenses because the London cover note did not provide for such expenses. On appeal, Armada does not raise this issue. Instead, both Armada and Banorte dispute various amounts of sue and labor expenses allowed and disallowed.

## DISCUSSION

A. *The District Court's Personal Jurisdiction Over Banorte*

■ Banorte's chief claim on appeal is that the entire judgment against it should be set aside for lack of personal jurisdiction. Banorte does not dispute that if jurisdiction properly attached, it would be subject as lead underwriter to a judgment for the full amount owed to Armada by the Brazilian underwriters. Banorte can of course seek to recover from the other Brazilian underwriters.

Banorte's activities in New York were more than sufficient to render it subject to the in personam jurisdiction of the district court. Banorte, at the request of Petrobras, a company doing business in New York, issued a certificate of insurance to Armada, another corporation qualified to do business in New York. The certificate stated that the cargo's destination was "New York–USA," and was delivered to Armada's New York bank in order to obtain payment on a letter of credit while the cargo was located at Stapleton Anchorage in New York. These facts alone would be sufficient under Section 1213 of the New York Insurance Law to subject Banorte to the district court's jurisdiction. Section 1213 provides that:

> the issuance or delivery of contracts of insurance to residents of this state or to corporations authorized to do business therein, ... is equivalent to and constitutes its appointment of the superintendent, and his successors in office, to be its true and lawful attorney upon whom may be served all lawful process in any proceeding instituted by or on behalf of an insured or beneficiary arising out of any such contract of insurance, and shall signify its agreement that such service of process is of the same legal force and validity as personal service of process in this state upon such insurer.

N.Y.Ins. Law § 1213(b)(1)(A) (McKinney 1985). *Ringers' Dutchocs, Inc. v. S.S. S.L. 180*, 494 F.2d 678 (2d Cir.1974), cited by Banorte, is easily distinguishable. In that case the certificate was issued to "the bearer," while the certificate here was issued directly to a company authorized to do business in New York.

Moreover, Banorte clearly "transacted business" in New York within the meaning of Section 1213(b)(1)(D) of the New York Insurance Law and Section 302(a)(1) of the New York Civil Practice Law and Rules ("C.P.L.R."). It issued an insurance certificate on property located in New York, appointed a New York firm to receive notice of the claim, engaged a New York surveyor to attend the vessel, and designated two representatives in New York to investigate and adjust the claim. *Cf. Naso v. National Union Fire Ins. Co.*, 156 F.Supp. 611, 615 (S.D.N.Y.1957). It is true that New York has declined to exercise jurisdiction grounded solely on the activities of a lawyer. *Haar v. Armendaris Corp.*, 31 N.Y.2d 1040, 294 N.E.2d 855, 342 N.Y.S.2d 70 (1973). But that case involved a suit by an attorney on his own behalf against his client for legal fees, rather than a suit by a third party. Here the suit was by a third party, and the fact that one of the persons selected to adjust the claim was a lawyer does not defeat jurisdiction. *See Parke-Bernet Galleries, Inc. v. Franklyn*, 26 N.Y.2d 13, 19 n. 2, 256 N.E.2d 506, 509 n. 2,

308 N.Y.S.2d 337, 341 n. 2 (1970) (jurisdiction over principal is present where "the cause of action [arose] out of transactions with third parties conducted through an agent"). The other cases relied on by Banorte, unlike the instant case, concern situations where no relation existed between the defendant's activities within the state and the claims.

■ Banorte was also subject to the district court's in personam jurisdiction under Section 302(a)(1) of the C.P.L.R. because it "contract[ed] [in Brazil] to supply ... services in [New York]." Clearly, contracting to insure property located within a jurisdiction, even if the presence of that property is transitory, subjects a foreign marine-insurer to jurisdiction on suits over such insurance. *See Puerto Rico v. SS Zoe Colocotroni*, 628 F.2d 652, 667–70 (1st Cir. 1980), *cert. denied*, 450 U.S. 912, 101 S.Ct. 1350, 67 L.Ed.2d 336 (1981); *American & Foreign Ins. Ass'n v. Commercial Ins. Co.*, 575 F.2d 980, 982 (1st Cir.1978); *Atlantic Lines, Ltd. v. M/V Domburgh*, 473 F.Supp. 700, 702–04 (S.D.Fla.1979). Finally, no constitutional barriers existed to the district court's exercise of personal jurisdiction over Banorte on these facts. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (upholding Florida law similar to C.P.L.R. § 302(a)(1) "contracts anywhere" clause); *McGee v. International Life Ins. Co.*, 355 U.S. 220, 78 S.Ct. 99, 2 L.Ed.2d 223 (1957) (nonresident insurer who delivered policy to California resident had sufficient minimum contacts to be subject to jurisdiction of California courts); *Travelers Health Ass'n v. Virginia*, 339 U.S. 643, 70 S.Ct. 927, 94 L.Ed. 1154 (1950) (upholding Virginia law similar to New York Insurance Law § 1213).

## B. *The Increased–Value Clause*

Relying on expert testimony, Judge Griesa found that the increased value clause of the London policy was solely against physical loss of or damage to cargo, and not against lost profits. The clause "served [only] to increase the amount of the insured value over and above the amount provided in the primary Brazilian insurance," and "[t]he particular average method of adjustment applies to the contamination loss claim." 665 F.Supp. at 1051. We agree.

Marine insurance typically insures against risk of loss of, or damage to, cargo. Under the standard marine policy, the underwriter and assured agree on an "insured value," or policy limit. *See* G. Gilmore & C. Black, *The Law of Admiralty* 86–90 (2d ed. 1975). In the event of damage, the amount paid would equal the percentage of the loss times the insured value. For example, if the insured value is $100, and there is a ten percent loss, the assured would be entitled to $10. On the other hand, if the insurance were to protect against loss of contract and the assured suffers a ten percent loss and loses the contract, the assured would receive the full value of the lost contract from the underwriter or $100.

Increased-value coverage serves to increase the insured value beyond what is insured under the primary insurance. In this case, the increased value was based on the Sun contract. Armada had two policies, with two insured values. Liability would be shared by both sets of underwriters as follows: The full insured value of the cargo was $30.55 per barrel ($28.27 or $9,855,333 for the Brazilians = $25.70 spot price in New York on the date the vessel left Rio + ten percent and $2.28 for London). In the case of a total loss (e.g., shortage loss), the Brazilian underwriters would bear 92.5 percent and the London underwriters 7.5 percent.

In the case of a contamination of cargo, the extent of the loss is measured by the "particular average" method of adjustment. *See* L. Buglass, *supra*, at 167–74 (1981); G. Gilmore & C. Black, *supra*, at 87–89. Under this method of adjustment, the recovery is based on the following equation:

$$P = \frac{SMV - DV}{SMV}$$

where: SMV (sound market value at a particular location and time), DV (damaged market value as of that time and place),

and P (percentage of deterioration). The resulting percentage is then applied to the insured value to obtain the amount of recovery under the particular policy. Armada concedes that this method of adjustment applied to its claims under the Brazilian policy. It claims, however, that Judge Griesa should not have applied this method to its claims under the London policy because that policy covered profits and not cargo. We disagree.

■■■ An assured may purchase marine insurance on lost profits. *See* 1 M. Mustill & J. Gilman, *Arnould's Law of Marine Insurance and Average*, ¶ 318, at 206 (16th ed. 1981). Ordinary marine insurance, however, covers lost cargo but not lost profits. Coverage against the latter exists only when the "policy specially provid[es] for such an event." *Royal Exch. Ins. Co. v. McSwiney*, 14 Q.B. 646, 663 (Adol. & El. N.S. 1849). As an example, on this side of the Atlantic, the policy at issue in *Canada Sugar Refining Co. v. Insurance Co. of North America*, 175 U.S. 609, 613, 20 S.Ct. 239, 240, 44 L.Ed. 292 (1900), contained such an express provision.

■ The London increased-value insurance was "on concurrent conditions" with the primary insurance, which covered cargo but not profits. This provision strongly supports Judge Griesa's finding that the London insurance was against cargo loss rather than lost profits, and that Armada was simply increasing its insured value beyond the Brazilian insurance, rather than purchasing a different kind of insurance. Moreover, the cover letter of the policy explicitly states that what is covered is "crude oil in bulk," never mentioning profits, and measures the amount insured as the difference between the sum insured by

Armada's seller—Petrobras—and Armada's resale price. Had there been a total loss, the full insured amount would have been recoverable. Here, where there was only a partial loss, a percentage of the agreed insured amount that reflects the percentage of the damage to the value of the cargo was recovered. This calculation of contamination loss was properly determined by particular average adjustment.

Armada claims that the "structure and language" of the policy support the construction that it covered lost profits. We find this argument lacking. The policy does state that, with respect to cargo carried on C.I.F. terms, it would cover "on concurrent conditions, increased value which may occur during the period of this insurance." Increasing the amount insured under cargo insurance under a particular contract, however, does not change the terms of the insurance from insuring physical loss to lost profits. The London underwriters assumed the risk of upward fluctuation of prices of lost cargo, but not of lost profits because an entire deal fell through. It is also true that particular average adjustment reduced the underwriter's liability. But that is precisely what occurs when insurance is on cargo and not profits and when particular average adjustment applies.[4]

Armada's final argument with respect to increased value is that, because of the rule that ambiguities in a policy must be construed against the insurer, *see Ingersoll Milling Mach. Co. v. M/V Bodena*, 829 F.2d 293, 306 (2d Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 774, 98 L.Ed.2d 860 (1988), this policy should be construed to

---

4. Armada relies on *Standard Marine Insurance Co. v. Scottish Metropolitan Assurance Co.*, 283 U.S. 284, 51 S.Ct. 371, 75 L.Ed. 1037 (1931), for the proposition that increased-value insurance should be construed as insurance against lost profits. In that case, the court noted the difference between insurance against cargo and insurance against lost profits. However, the issue was whether an increased-value insurer was subrogated to an assured's recovery from a colliding ship, and the Court held that it was not. It thus made no difference in *Standard Marine* on the question of subrogation that the in-

creased-value insurance was on cargo or profits because in either case it did not cover that part of the cargo value that was recoverable from the negligent ship. *Id.* 283 U.S. at 289, 51 S.Ct. at 373. Moreover, although the Court stated that the increased-value coverage was for lost profits, *id.* at 288, 51 S.Ct. at 372, it left open whether that would be true in all cases. *Id.* at 289, 51 S.Ct. at 373. Finally, as Judge Griesa noted, the policy here, unlike in *Standard Marine*, was "on concurrent conditions" with the primary insurance, and it is not disputed that the Brazilian insurance was on cargo and not profits.

cover profits. We do not believe that this policy is ambiguous, however.

We next turn to whether the London underwriters were bound by the alleged representations of J & H, a Houston broker, that the insurance would cover lost profits. After reviewing conflicting evidence, Judge Griesa found that: (i) Armada's Carolyn Brown and J & H's James Anderson did not discuss insurance against loss of profits for the Sun contract at the meeting on November 30, 1982; (ii) Brown did *not* ask for, nor did Anderson agree to, coverage on lost profits; and (iii) Anderson's testimony was consistent with the London underwriters' position that the increased value coverage applied only to damage to property. Judge Griesa found that what they did discuss was Armada's desire to "protect" its profits by invoking the increased-value clause of the cover letter. They apparently did *not* discuss "the distinction between the concept of increasing the *insured value* based on the amount of [the] contract and the concept of insuring against the loss of a contract as such." 665 F.Supp. at 1059 (emphasis in original). We disagree with Armada's claim on appeal that these findings were clearly erroneous. Our review of the record hardly leaves us " 'with the definite and firm conviction that a mistake has been committed.' " *Anderson v. Bessemer City*, 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518 (1985) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)).

Moreover, Judge Griesa found that J & H did not have actual or apparent authority to bind the London underwriters. The J & H witnesses testified that they did *not* have authority to change the terms of the London policy. Nor was there any evidence that the London underwriters represented that J & H had authority to bind them to insurance coverage. Similarly, the cover note indicated that J & H was *Armada's* broker, and the letter that *Lloyd's Underwriters' Non–Marine Association* sent to Willis Farber on May 13, 1982, which Armada emphasizes, excluded ocean marine insurance. Moreover, none of the underwriters involved here had given Willis Farber the authority to bind them to any insurance from J & H. Finally, any responsibility of the underwriters for J & H's acts under Article 21.14, Section 2 of the Texas Insurance Code was obviated by J & H's failure to comply with state registration requirements for local recording agents. Accordingly, we uphold Judge Griesa's conclusion that "as a matter of fact and law, no agreement was made at the November 30 meeting binding the London underwriters to insurance against loss of the Sun contract or the profits thereon." 665 F.Supp. at 1067.

## C. *Contingency Coverage*

The cover letter expressly required that contingency coverage would apply only when Armada made a C.I.F. sale to its purchaser and provided a certificate of insurance to that purchaser. Armada did not do so. These requirements were a material term of the contingency coverage and thus cannot be disregarded. Armada's reliance on *Welded Tube Co. v. Hartford Fire Ins. Co.*, 1973 A.M.C. 555 (E.D.Pa.1973), on the issue of materiality of the identity of the insured is misplaced. That decision is not authority for substituting a new form of coverage for the assured's protection for a form of insurance intended to protect third parties, as Armada attempts to do. Armada could have purchased insurance on the risk that the Brazilians would not provide coverage—a guarantee of collectability—but did not do so.

In any event, Armada claims that the London underwriters' acceptance and retention of a premium for contingency coverage waived any objection they may have had to such coverage. We disagree. The evidence indicates that J & H mistakenly billed Armada for this coverage before any question of coverage had been resolved and that the London underwriters denied coverage as soon as the facts of the transaction became fully known. Moreover, the payment of a premium alone does not justify the rewriting of an insurance contract. *See Travelers Indem. Co. v. Holman*, 330

F.2d 142, 144 n. 1 (5th Cir.1964) (waiver cannot change coverage of policy). In the cases cited by Armada, the insurer waived a breach of the policy conditions by accepting payment of a premium. *See, e.g., Aetna Ins. Co. v. C.I.T. Corp.*, 74 F.2d 516, 518 (5th Cir.1934). These cases cannot justify creating coverage where none clearly existed. Accordingly, we uphold Judge Griesa's finding that the London underwriters were not liable for contingency coverage.

## D. *Armada's Damages*

Finally, we consider Banorte's and Armada's claims that Judge Griesa did not properly calculate Armada's damages for contamination loss, shortage loss, and sue and labor expenses incurred in reconditioning the contaminated oil.

### 1. Contamination Loss

■ The district court used the "particular average" method of adjustment to compute contamination loss. Banorte challenges the district court's calculations regarding the Vanol and Montello sales. With respect to the Vanol sale, Banorte claims that in determining the "damaged market value" to be used in the particular average formula, the district court erred by deducting from the sale price the $90,054.79 Armada paid to transport the oil to Vanol's Philadelphia terminal (this oil had been sold to Vanol on a delivered basis). Under such circumstances, obviously it was necessary to deduct the freight from the sale price to determine the "damaged market value" at the time and place of the sale. *See* L. Buglass, *supra*, at 172–73. Similarly, the district court did not err in selecting the actual proceeds ($23.16 per barrel) as compared to the contract price ($25.35 per barrel), in calculating the damaged market value of the oil sold to Montello. Following delivery, Montello had refused to pay the contract price on the ground that the oil was not in sound condition. The parties subsequently agreed to a lower price per barrel that in all likelihood reflected the true market value of the oil on delivery.

■ In its cross-appeal, Armada claims that the district court should have entered an award for contamination loss with respect to the last four sales of reconditioned oil (second sale to Vanol and the Belcher, Scanoil, and Apex sales) and the unsold oil remaining at the end of the reconditioning process (about 6,000 barrels). We disagree. The calculation of contamination loss under the particular average method of adjustment requires that the assured produce evidence, by survey, expert testimony or otherwise, of the value of the contaminated oil that has been reconditioned. In the absence of such proof, the assured cannot recover. Here, Judge Griesa found that Armada did not submit sufficient proof as to the value of the reconditioned oil.

■ Armada also claims that the amounts received on the four sales and the quantity of oil left at the end of the reconditioning process were an appropriate measure of the oil's value. As Judge Griesa found, however, the prices in Armada's second sale to Vanol and its sale to Belcher were based on specifications that greatly differed from the actual condition of the oil and thus did not reflect the market's assessment of the oil's value in its actual damaged condition. With respect to the Scanoil sale, we see no reason to upset Judge Griesa's finding that this oil was sound prior to delivery. Moreover, in each of these sales, the condition of the oil was determined *after*, not before, the contract was entered into and the price fixed. Under such circumstances, the market price was hardly probative evidence of the oil's value. Finally, as to the unsold oil, the evidence submitted—analysis of the "leftovers" of uncontaminated oil in the tank from which the oil sold to Apex had been transferred—indicated that the oil was sound. In its brief, Armada treats the unsold cargo as a total loss, but the single fact that cargo remains unsold does not turn it into a partial or total loss for cargo insurance purposes. Armada remained responsible for providing evidence of the amount of unsold oil that was contaminated.

### 2. Shortage Loss

■ The Banorte certificate and London policy provided for a 0.5 percent deductible on any shortage loss. Such a deductible is customary in the shipment of oil and serves to relieve the underwriter from having to pay for a certain amount of "clingage" of oil to the tanks of the vessel as a shortage loss. Armada does not dispute that this 0.5 percent deductible applied to the voyage on the AGIOS NIKOLAS, but rather claims that the district court erred in allowing a second deductible ($53,250.79) for the removal of the oil from the AGIOS NIKOLAS into barges in Bayonne. (Armada had been forced to offload the cargo onto barges because of the size of the pier in Bayonne.) In making this claim, Armada restates the accepted principle of contract law that any inconsistency between printed form and typed language should be resolved in favor of the typed provision. The typed language of the Banorte certificate provided coverage:

> FROM WAREHOUSE TO WAREHOUSE AGAINST ALL RISKS OF LOSS OR DAMAGE, SUBJECT TO THE CONDITIONS OF THE INSTITUTE CARGO CLAUSES ("ALL RISKS"). LOSS PAYABLE AGAINST VOLUME LOSSES IN EXCESS OF 0.5 PERCENT AND ALL RISKS AND INCLUDING CONTAMINATION.

Armada's citation of this provision omits, however, the incorporation of the Institute Cargo Clauses. Armada Br. at 51. Judge Griesa based his decision as to the deductibles on these clauses. Moreover, because these clauses were an integral part of the typed provision, no conflict existed between the typed and printed language. One Institute Clause provides:

> Including any transit by craft, raft or lighter to or from the vessel. Each craft, raft or lighter to be deemed a separate insurance. The Assured are not to be prejudiced by any agreement exempting lighterman from liability.

This clause thus makes each trip by "craft, raft or lighter" a separate event for purposes of insurance on the assumption that cargo will be lost due to clingage on each voyage. Accordingly, we affirm Judge Griesa's finding that there were two deductibles.

### 3. Sue and Labor Expenses

■ Sue and labor expenses are those reasonable costs borne by the assured to mitigate the loss and thus reduce the amount to be paid by the underwriter. Banorte claims that Judge Griesa erred in allowing certain expenses that were not reasonably or necessarily incurred. Armada crossappeals from his findings that certain expenses that it incurred were not reimbursable as sue and labor expenses.

We address first the individual items of sue and labor expenses totalling $529,-088.40 challenged by Banorte. We reject that challenge.

a. Inspection costs ($10,121.12). Banorte challenges $5,464.62 of this amount, claiming that initial surveys were required under Armada's contract with Sun. However, this expense was necessary to determine the amount of contamination and obviously would not have been incurred had the cargo not been damaged. Judge Griesa was careful not to include the two inspections made in the ordinary course of business with the Sun transaction.

b. Custom bond & duty ($22,675.69) and New York spill tax ($2,865.27). Armada paid these taxes in order to bring the oil ashore for reconditioning, and they would not have otherwise been incurred.

c. Barging and demurrage ($111,-783.76). These expenses were incurred in offloading the oil onto barges for transportation to the reconditioning facility at Bayonne and were obviously reimbursable as a necessary step in the reconditioning process. This facility, which did not have a pier of sufficient length to accommodate the AGIOS NIKOLAS, was apparently the only terminal with segregated tank space available for reconditioning.

d. Legal expenses ($90,819.00). Banorte challenges all but $16,945.00 of these, claiming that the expenses were not, as Judge Griesa found, incurred to secure the return of the vessel to New York harbor and to pursue the claim against the vessel.

Banorte stipulated, however, that those expenses related to the AGIOS NIKOLAS. Armada certainly acted in a reasonable manner in pursuing the claim against the vessel as the Banorte certificate provided that Armada was to "ensure that all rights against carriers, bailees or other third parties are properly preserved and exercised."

e. Travel expenses ($9,268.34). These expenses were incurred by Armada's representative in supervising the reconditioning process. Banorte's claim that $8,585.24 of the amount awarded "pertains to resales" is not supported in the record.

f. Unrecovered payment ($22,870.23). Armada paid the vessel owner's claim for unpaid freight of $556,000.00 in order to obtain the return of the AGIOS NIKOLAS to New York. Of this amount, Armada eventually obtained all but $22,870.23 from Petrobras, which was liable for the freight under the sales contract. As Judge Griesa found, "[t]he fact that the crew demanded an amount, part of which was improperly labelled 'freight,' should not detract from the conclusion that this expenditure was made to minimize Armada's (and underwriters' losses)." 665 F.Supp. at 1076.

g. Interest ($281,669.59). Judge Griesa held that this item "did not involve an actual out-of-pocket expense on the part of Armada," but represented "the assumed cost, or economic loss, involved in holding the bulk of the cargo for a substantial amount of time while reconditioning efforts were being carried on." *Id.* at 1077. He nevertheless allowed this item of damages, despite the testimony of John Blackwell, an expert for the London underwriters, that sue and labor expenses only concern actual direct expenses and not assumed or indirect costs. Blackwell also stated this item was "part of the assured's normal trading expenses," and that it was not normal practice in the insurance industry to pay it, even if the expense was increased by the need for reconditioning. On appeal, as it did below, Banorte further claims that "plaintiff would be made whole by prejudgment interest," and thus, that any award of interest would be "interest on interest."

Our reading of the record differs from that of Judge Griesa, although we agree with the outcome. Anthony Wright, Armada's financial vice-president, testified that Armada "had to borrow from [Bank Paribas] to carry the oil during the reconditioning process." This loan was apparently for the period after payment was due to Petrobras but before receipt of payment from the buyers. On the basis of Wright's testimony that Armada actually paid interest for carrying the oil, therefore, we see no reason to upset Judge Griesa's award. If the oil had arrived in sound condition, it would have been delivered and paid for immediately. Under such circumstances, Armada would not have incurred this interest expense. Thus it was a proper sue and labor expense related to the reconditioning of the oil. *Cf. Ingersoll Milling Mach. Co. v. M/V Bodena,* 619 F.Supp. 493, 508 (S.D. N.Y.1985) ("There is resistance to the claim of $90,969.65 for interest for delay in receiving payment from [the buyer] for the [cargo]. This is a legitimate item."), *aff'd,* 829 F.2d 293 (2d Cir.1987), *cert. denied,* — U.S. ——, 108 S.Ct. 774, 98 L.Ed.2d 860 (1988).

We now turn to the individual items of the sue and labor expenses that Armada claims in its cross-appeal should have been awarded. We reverse the failure to award these amounts.

a. Legal expenses related to Montello sale ($227,432.00). After Montello refused to accept reconditioned oil at the agreed-upon price, Armada brought suit against it for breach of contract. This suit was subsequently settled with Montello agreeing to pay an additional $285,000 to Armada. As a result, Armada's claim against the underwriters was reduced from $461,889 to $151,750—a savings to Banorte of more than $300,000. Judge Griesa denied Armada reimbursement for $227,432 in legal expenses it had incurred in pursuing the suit against Montello, reasoning that "[e]xpenses incurred solely for the purpose of concluding a sale cannot be considered sue and labor expenses recoverable from the underwriters." 665 F.Supp. at 1076. We disagree. Armada spent

these sums in order to sell the cargo, and they were expenses that would not have been incurred if there had not been a casualty. Banorte saved money as a result of Armada's efforts and therefore should bear the costs of those savings. *See Ingersoll Milling Co.*, 619 F.Supp. at 507 ("[A]ttorneys' fees are awarded in maritime cases in order to make the insured whole" and "in view of the fact that plaintiff's recovery against [the insurer] will be reduced by whatever the former recovers from the other defendants.").

■ b. Commissions ($8,559.84). Armada seeks to recover the commissions it paid for arranging the sale of the damaged cargo. As these commissions were related only to the sale rather than reconditioning of the oil, Judge Griesa disallowed this item. We disagree. As with the lawyers' fees related to the Montello suit, Armada paid these commissions to mitigate damages and thus to reduce Banorte's exposure.

■ c. Second deductible on shortage claim ($53,250.79). Armada claims that even if it is subject to a second deductible on the shortage losses, *see* discussion *supra*, the amount of this deductible should be allowed as a sue and labor expense. Judge Griesa disagreed, reasoning that "[t]he Brazilian insurance cannot properly be construed as having the item subtracted under the deductible clause and then having it restored under the sue and labor provision." 665 F.Supp. at 1077. Again, we disagree. It was only because of the need to recondition the cargo that Armada was forced to transship by barge. Any loss in volume was thus caused by the need to recondition. Moreover, Judge Griesa's reasoning is questionable in light of the fact that sue and labor clauses have been viewed as separate insurance. *See Reliance Insurance Co. v. THE ESCAPADE*, 280 F.2d 482, 489 n. 11 (5th Cir.1960).

## CONCLUSION

For the foregoing reasons, we affirm in part and reverse in part.