**Charles A. CARONIA, Plaintiff,**

v.

**AMERICAN RELIABLE INSURANCE COMPANY, Canadian Heritage Livestock Insurance Brokers, Ltd, and Canadian Livestock Insurance, Defendants.**

**No. CV 97–0580(ADS).**

United States District Court,
E.D. New York.

March 23, 1998.

Tackel & Varachi, L.L.P., White Plains, NY by Martin S. Tackel, of counsel, for Plaintiff.

Brody & Fabiani,. New York City by John V. Fabiani, Jr., Daniel O. Dietchweiler, of counsel, for Defendant Canadian Heritage Livestock, Insurance Brokers, Ltd. & Canadian Livestock Insurance.

Harvey A. Feintuch, Mineola, NY, for Defendant American Reliable Insurance Company.

## MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

This diversity-breach of contract action arises from the claims of the plaintiff, Charles A. Caronia ("the plaintiff" or "Caronia") that the defendant, American Reliable Insurance Company ("American Reliable"), and Canadian Heritage Livestock Insurance Brokers, Ltd. and Canadian Livestock Insurance (referred to collectively as "Canadian") owe him money under a livestock insurance policy. Presently before the Court is Canadian's motion to dismiss the complaint for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2), which is opposed by the plaintiff and by American Reliable.

## I. BACKGROUND

The plaintiff, Caronia, is an individual who owns thoroughbred race horses. He maintains residences in both Nassau County, New York and in Florida. At all relevant times, Caronia's horses were racing and quartered in New York for approximately nine months of the year.

The defendant Canadian is a Canadian corporation engaged in the business of insurance brokerage, particularly livestock mortality insurance. Canadian's principal office and place of business is located in the Province of Ontario, Canada. John D. Carlton, Sr. ("Carlton"), Canadian's owner and president, has a license issued by the State of New York to engage in insurance brokerage within the State.

On February 14, 1994, Carlton, on behalf of Canadian, faxed a letter to Caronia's Florida residence, and offered to provide him with mortality insurance coverage for his thor-

oughbred horses. In response to the facsimile, Caronia called Carlton for information and eventually purchased livestock mortality insurance for three of his horses. The insurance policy was issued through Lloyds of London and included $75,000 in coverage for one of Caronia's thoroughbred horses named "Dominant Prospect."

During their telephone negotiations, the parties agreed that Canadian would forward the insurance policy and all future billing to Caronia's New York residence. Pursuant to this arrangement, Canadian mailed the policy to Caronia in New York, along with a cover letter, dated March 11, 1994, which stated that two invoices were enclosed for the policies on Dominant Prospect and another horse. Several months later, on or about July 13, 1994, Caronia increased the policy coverage of Dominant Prospect from $75,000 to $200,000, once again through Lloyds of London.

Approximately half a year later, in early 1995, Canadian solicited the renewal of the insurance coverage on Dominant Prospect, and offered Caronia a new policy with a different company, the defendant American Reliable. At this stage of the litigation, it is unclear how Canadian communicated the solicitation. In any event, Caronia apparently agreed to the renewal and increased his coverage of Dominant Prospect from $200,000.00 to $300,000.00. By a "cover note" mailed to Caronia's New York home, dated March 3, 1995, Canadian documented the increase in coverage and sought payment of the premium. The cover note set forth Caronia as the insured, and listed Caronia's New York home as the insured's address.

Later that year, in December 1995, Canadian sent to Caronia at his New York home a letter soliciting renewal of the coverage for Dominant Prospect. The letter also provided a toll-free number for Caronia to use when contacting Canadian. Caronia responded on February 14, 1996, by placing a phone call to Canadian, and speaking to one of Canadian's employees, a broker named Holly Hewitt. While the facts are in dispute, it is clear that during the conversation, they discussed whether the policy could be modified for several months while Caronia's horses were not racing. According to Canadian's version of the conversation, which Caronia disputes, Caronia told Hewitt that he wanted the insurance coverage of Dominant Prospect to be reduced to $50,000. Regardless of the actual content of the conversation, Hewitt immediately relayed instructions to renew and modify the policy to a London intermediary which, on February 15, 1996, issued a cover note reflecting that American Reliable was bound for the reduced amount of $50,000 insurance coverage for Dominant Prospect.

Later that month, Dominant Prospect failed to live up to his name and was euthanized due to illness. On March 11, 1996, Caronia signed a livestock proof of loss, and asked for $50,000 in insurance coverage plus $4,950 for surgical costs. Several weeks later, on April 23, 1996, Caronia signed an amended livestock proof of loss seeking $300,000 in coverage, plus $11,800 for surgical costs. Subsequently, American Reliable paid Caronia the amount he initially requested—$54,950—and refused to pay the greater amount he demanded in his amended livestock proof of loss—$311,800.00.

Thereafter, Caronia commenced a lawsuit against American Reliable in the Supreme Court of the State of New York, Nassau County. The gravamen of Caronia's complaint is that he never requested a reduction from $300,000 to $50,000 in insurance coverage of Dominant Prospect, and therefore, American Reliable is liable for the higher amount of coverage, less the $54,950 the company already paid him. The defendant American Reliable initiated a cross-claim against Canadian for indemnity and contribution. In February 1997, American Reliable filed a Notice of Removal to this Court.

Presently before the Court is the motion of the defendant Canadian to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(2) for lack of personal jurisdiction. According to Canadian, there is no basis for in personam jurisdiction because the plaintiff has failed to establish the requirements set forth in New York's long-arm statute, New York Civil Practice Law and Rules ("CPLR") §§ 301 and 302. The plaintiff and the defendant American Reliable oppose the motion, arguing that Canadian fulfilled the statutory and

constitutional requirements for in personam jurisdiction by "transacting business" within New York State.

## II. DISCUSSION

### A. Personal Jurisdiction Under New York Civil Practice Law And Rules ("CPLR")

Prior to discussing the issues presented by Canadian's motion to dismiss, the Court will set forth several general principles applicable to motions challenging personal jurisdiction.

If the Court relies on the pleadings and affidavits alone, the plaintiff need only make a prima facie showing of jurisdiction in order to defeat the motion to dismiss. *PDK Labs, Inc. v. Friedlander,* 103 F.3d 1105, 1108 (2d Cir.1997); *Welinsky v. Resort of World D.N.V.,* 839 F.2d 928, 930 (2d Cir.1988). Moreover, the pleadings and affidavits should be construed in the light most favorable to the plaintiff, and all doubts resolved in his favor. The Court should also keep in mind that "personal jurisdiction inquiries are 'necessarily fact sensitive because each case is dependant upon its own particular circumstances.'" *PDK Labs. Inc., supra,* 103 F.3d at 1108 (quoting *Landoil Resources Corp. v. Alexander & Alexander Services, Inc.,* 918 F.2d 1039, 1043 [2d Cir.1991]).

■ Personal jurisdiction over a defendant in a diversity action is determined by the law of the forum state. *CutCo Industries, Inc. v. Naughton,* 806 F.2d 361, 365 (2d Cir.1986); *Arrowsmith v. United Press International,* 320 F.2d 219, 223 (2d Cir.1963)(*en banc*). Consequently, the Court looks to New York's personal jurisdiction statutes, CPLR §§ 301 and 302, to determine whether the plaintiff has set forth a prima facie showing of in personam jurisdiction over the defendant. *See Slapshot Beverage Company, Inc. v. Southern Packaging Machinery, Inc.,* 980 F.Supp. 684, 686 (E.D.N.Y.1997).

CPLR § 301 confers jurisdiction over a nondomiciliary defendant "on causes of action wholly unrelated to acts done in New York, ... when the defendant is engaged in such a continuous and systematic course of 'doing business' [in New York] as to warrant a finding of its 'presence' in the jurisdiction."

*Ball v. Metallurgie Hoboken–Overpelt, S.A.,* 902 F.2d 194, 198 (2d Cir.1990)(quotations omitted), *cert. denied,* 498 U.S. 854, 111 S.Ct. 150, 112 L.Ed.2d 116 (1990).

By contrast, CPLR § 302(a)(1) authorizes the exercise of personal jurisdiction over a nondomiciliary "who in person or through an agent ... transacts any business within the state or contracts anywhere to supply goods or services in the state." "A nondomiciliary 'transacts business' under CPLR 302(a)(1) when he 'purposefully avails [himself] of the privilege of conducting activities within [New York], thus invoking the benefits and protections of its laws.'" *CutCo Industries, Inc. v. Naughton, supra,* 806 F.2d at 365 (internal citations and quotations omitted). "No single event or contact connecting the defendant to the forum state need be demonstrated; rather, the totality of all defendant's contacts with the forum state must indicate that the exercise of jurisdiction would be proper." *Id.* (Citing *Sterling National Bank and Trust Co. of New York v. Fidelity Mortgage Investors,* 510 F.2d 870, 873–74 [2d Cir.1975]; *Longines–Wittnauer Watch Co. v. Barnes & Reinecke, Inc.,* 15 N.Y.2d 443, 457 n. 5, 261 N.Y.S.2d 8, 209 N.E.2d 68, *cert. denied,* 382 U.S. 905, 86 S.Ct. 241, 15 L.Ed.2d 158 [1965]).

Although it is not mentioned by any of the parties, Section 1101 of the New York Insurance Law sets forth the relevant statutory provision as to what constitutes "doing an insurance business" for jurisdictional purposes under CPLR § 302. This statute provides, in relevant part, the following:

1101. Definitions; doing an insurance business

(a) In this article: (1) "Insurance contract" means any agreement or other transaction whereby one party, the "insurer", is obligated to confer benefit of pecuniary value upon another party, the "insured" or "beneficiary", dependent upon the happening of a fortuitous event in which the insured or beneficiary has, or is expected to have at the time of such happening, a material interest which will be adversely affected by the happening of such event.

...

(b)(1) Except as [otherwise] provided ... any of the following acts in this state, effected by mail from outside this state or otherwise, by any person, firm, association, corporation or joint-stock company shall constitute doing an insurance business in this state and shall constitute doing business in the state within the meaning of section three hundred two of the civil practice law and rules:

(A) making, or proposing to make, as insurer, any insurance contract, **including either issuance or delivery of a policy or contract of insurance to a resident of this state** or to any firm, association, or corporation authorized to do business herein, **or solicitation of applications for any such policies or contracts;**

...

(C) **collecting any premium, membership fee, assessment or other consideration for any policy or contract of insurance;**

(N.Y. Ins. Law § 1101)(emphasis added).

It is within this framework that the Court addresses the grounds for the defendant Canadian's motion to dismiss for lack of personal jurisdiction.

■ The Court concludes that the plaintiff has made a prima facie showing that Canadian's conduct falls within the definition of "doing an insurance business" as defined in Insurance Law Section 1101, so to confer personal jurisdiction over Canadian within the State of New York. "Over the course of the parties' approximately [two-year] relationship, [Canadian] mailed policies and policy renewals to [Caronia], serviced the subject policies via both mail and telephone, and billed and collected premiums from [Caronia]. Such actions by [Canadian] were both sufficient to constitute 'doing business' in New York pursuant to the relevant provisions of the Insurance Law and to constitute 'minimum contacts' with New York such that the maintenance of an action in this State would not offend traditional notions of fair play and substantial justice, as such that [Canadian] reasonably could have anticipated being haled into the courts of this State." *U.N.F. Services, Inc. v. Insurance Co. Of*

*North America, et al.*, 236 A.D.2d 388, 389, 653 N.Y.S.2d 366, 367 (2d Dept.1997)(internal citations omitted). Accordingly, the Court finds ample basis for concluding that Canadian's activities fall within the ambit of Insurance Law § 1101(b)(1) for jurisdictional purposes.

■ Even absent any reliance on § 1101 of the Insurance Law, it is obvious that the there exists sufficient basis for jurisdiction under CPLR § 302(a)(1) because Canadian " 'contract[ed] [in New York] to supply ... services in [New York].' Clearly, contracting to insure [thoroughbred race horses quartered] within [the] jurisdiction, even if the presence of that property is transitory, subjects a foreign []insurer to jurisdiction on suits over such insurance." *Armada Supply Inc. v. Wright*, 858 F.2d 842, 849 (2d Cir.1988)(citing *Puerto Rico v. SS Zoe Colocotroni*, 628 F.2d 652, 667–70 (1st Cir.1980), *cert. denied*, 450 U.S. 912, 101 S.Ct. 1350, 67 L.Ed.2d 336 (1981); *American & Foreign Ins. Ass'n v. Commercial Ins. Co.*, 575 F.2d 980, 982 (1st Cir.1978); *Atlantic Lines, Ltd. v. M/V Domburgh*, 473 F.Supp. 700, 702–04 (S.D.Fla.1979)).

■ For example, in *Armada Supply*, a foreign insurer had issued a certificate of insurance to a corporation qualified to do business in New York, for a cargo with the destination of New York. The contract was executed in Brazil. The Second Circuit upheld jurisdiction by applying the "contracts anywhere" wording in § 302(a)(1) in holding that the insurer "transacted business" in New York. *Armada Supply*, 858 F.2d at 849. The facts of this case clearly support jurisdiction under *Armada Supply*'s interpretation of the "contracts anywhere" language of § 302(a)(1). By providing insurance for a race horse quartered for nine months of the year within New York, Canadian "contracted to ... supply ... services in [New York]," *Id.; cf. A.I. Trade Finance, Inc. v. Petra Bank*, 989 F.2d 76 (2d Cir.1993)(holding that a financial guaranty payable in New York is a contract to perform services in New York, subjecting foreign guarantor to jurisdiction under § 302[a][1]).

The Court is not persuaded by Canadian's complaints that it should not be subjected to jurisdiction in a New York court because it has no offices here, conducted no meetings with the plaintiff here, and its agents purportedly have not visited the State. The defendant simply ignores the facts: (1) that it contracted to provide insurance coverage for a New York insured; (2) that it identified the insured's address as New York on nearly all the relevant paperwork; (3) that the insurance policy covered livestock quartered in New York for nine months of the year; (4) that it mailed the original insurance policies, invoices and billings to Caronia's New York residence; (5) that when it solicited the renewal of the policy, it sent a "cover note" to Caronia's New York home, dated March 3, 1995, documenting the increase in coverage and seeking payment of the premium; (6) that it mailed the next renewal solicitation letter, dated December 1995, to Caronia's New York home. Thus, while neither its offices nor agents were physically present within the State, there is no doubt that Canadian "transacted business" in New York. *See Rung v. U.S. Fidelity and Guaranty Co.,* 139 A.D.2d 914, 527 N.Y.S.2d 903 (4th Dep't 1988)(jurisdiction existed where the agency transacted business in New York by regularly corresponding by mail or telephone with the insured in New York through agent, by delivering insurance policy to agent and by sending invoices to agent and collecting premium payments).

The Court has reviewed the cases cited by the defendant and find that they are readily distinguishable. For example, in *Wilhelmshaven Acquisition Corporation v. Asher,* 810 F.Supp. 108, 113 (S.D.N.Y.1993), jurisdiction was lacking because "the center of gravity" of the transaction was in Germany. Here, by contrast, the insurance transaction was initiated in order to provide insurance coverage for the horses in New York. Thus the "center of gravity" is in New York.

*Advance Realty Associates v. Krupp,* 636 F.Supp. 316, 318 (S.D.N.Y.1986) and *Lawrence Wisser & Co., Inc. v. Slender You, Inc.,* 695 F.Supp. 1560, 1562 (S.D.N.Y.1988) are also inapposite. There, the courts held that telephone calls, mailings and faxes to the State were, in and of themselves, inadequate to confer jurisdiction. In this case Canadian's New York contacts are far more substantial. First, the horse which is the subject of this insurance controversy was quartered in New York for most of the relevant period. Second, the insured was known by the defendant to be a New Yorker. Third, the insurance policies, invoices, billings, solicitations for renewal, and correspondence were mailed to the insured's New York home.

In the Court's view, Canadian purposely availed itself of the privilege of transacting and doing insurance brokerage business in New York State. Jurisdiction within New York State is entirely proper.

### III. CONCLUSION

For the reasons set forth above, it is hereby

**ORDERED**, that the defendant's motion to dismiss the complaint for lack of personal jurisdiction over the defendant is denied.

**SO ORDERED.**